**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>WOODBRIDGE GROUP OF COMPANIES, LLC, *et al.*,[1]<br><br>Remaining Debtors. | Chapter 11<br><br>Case No. 17-12560 (BLS)<br><br>(Jointly Administered) |
| MICHAEL GOLDBERG, in his capacity as Liquidating Trustee of the WOODBRIDGE LIQUIDATION TRUST,<br><br>Plaintiff,<br><br>vs.<br><br>DAVID A. SCHOLL,<br><br>Defendant. | Adversary Proceeding<br>Case No. 19-__________ (BLS) |

**ADVERSARY COMPLAINT: (I) FOR AVOIDANCE AND RECOVERY OF AVOIDABLE TRANSFERS; AND (II) FOR SALE OF UNREGISTERED SECURITIES, FOR FRAUD, AND FOR AIDING AND ABETTING FRAUD**

[1] The Remaining Debtors and the last four digits of their respective federal tax identification numbers are as follows: Woodbridge Group of Companies, LLC (3603) and Woodbridge Mortgage Investment Fund 1, LLC (0172).

The Woodbridge Liquidation Trust (the "Liquidation Trust" or "Plaintiff"), formed pursuant to the *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* dated August 22, 2018 (Bankr. Docket No. 2397) (as it may be amended, modified, supplemented, or restated from time to time, the "Plan"[2]), as and for its *Adversary Complaint: (I) For Avoidance and Recovery of Avoidable Transfers; and (II) For Sale of Unregistered Securities, for Fraud, and for Aiding and Abetting Fraud* (this "Complaint") against David A. Scholl ("Defendant"), alleges as follows:

**NATURE OF THE ACTION**

1. At least since August 2012 until shortly before they sought bankruptcy protection, Woodbridge Group of Companies, LLC and its many hundreds of debtor affiliates (collectively, the "Debtors") were operated by their founder and principal, Robert Shapiro ("Shapiro"), as a Ponzi scheme. As part of this fraud, Shapiro and his lieutenants utilized the Debtors to raise over one billion dollars from approximately 10,000 investors as either Noteholders or Unitholders (collectively, "Investors").

2. Those Investors, many of whom were elderly, often placed a substantial percentage of their net worth (including savings and retirement accounts) with the Debtors and now stand to lose a significant portion of their investments and to be delayed in the return of the remaining portion. The quality of the Investors' lives will likely be substantially and adversely affected by the fraud perpetrated by Shapiro and his lieutenants.

3. The purpose of this lawsuit is (i) to avoid and recover monies previously paid to Defendant by reason of these activities, on the grounds that such payments were preferential,

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

actually fraudulent, and/or constructively fraudulent; and (ii) to hold Defendant liable for sale of unregistered securities, for fraud, and for aiding and abetting fraud.

## JURISDICTION AND VENUE

4. The Court has jurisdiction over this action under 28 U.S.C. §§ 157(a) and 1334. Counts I, II, III, and IV of this adversary proceeding are core within the meaning of 28 U.S.C. § 157(b)(2)(B), (C), (F), and (H), and Counts V, VI, and VII are non-core. Plaintiff consents to entry of final orders or judgment by this Court on all counts.

5. Venue of this adversary proceeding is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

***The Liquidation Trust***

6. On December 4, 2017 (the "Initial Petition Date"), certain of the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code. Other of the Debtors followed with their own voluntary cases (collectively with those of the original Debtors, the "Bankruptcy Cases") within the following four months (each such date, including the Initial Petition Date, a "Petition Date").

7. On October 26, 2018, this Court entered an order confirming the Plan (Bankr. Docket No. 2903).

8. The Plan provides for, *inter alia*, the establishment of the Liquidation Trust on the Effective Date of the Plan for the benefit of the Liquidation Trust Beneficiaries in accordance with the terms of the Plan and the Liquidation Trust Agreement. *See* Plan §§ 1.75, 5.4.

9. The Effective Date of the Plan occurred on February 15, 2019.

10. On February 25, 2019, the Court entered an order closing the Bankruptcy Cases of all Debtors except Woodbridge Group of Companies, LLC and Woodbridge Mortgage Investment Fund 1, LLC (together, the "Remaining Debtors"). The Remaining Debtors' Bankruptcy Cases are jointly administered under Case No. 17-12560 (BLS).

11. On the Effective Date, the Liquidation Trust was automatically vested with all of the Debtors' and the Estates' respective rights, title, and interest in and to all Liquidation Trust Assets. *See* Plan § 5.4.3. Further, the Liquidation Trust, as successor in interest to the Debtors, has the right and power to file and pursue any and all "Liquidation Trust Actions" without any further order of the Bankruptcy Court. *Id.* § 5.4.15. "Liquidation Trust Actions" include, *inter alia*, "all Avoidance Actions and Causes of Action held by the Debtors or the Estates …." *Id.* § 1.76.

12. In addition to its status as successor in interest to the Debtors and their estates, the Liquidation Trust also holds claims held by Investors who elected to contribute to the Liquidation Trust certain causes of action that those Investors possess against individuals such as Defendant (the "Contributed Claims"). *Id.* § 1.28 (defining "Contributed Claims" to include "All Causes of Action that a Noteholder or Unitholder has against any Person that is not a Released Party and that are related in any way to the Debtors, their predecessors, their respective affiliates, or any Excluded Parties, including … all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of any Notes or Units; … all Causes of Action based on, arising out of, or related to the misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and … all Causes of Action based on, arising out of, or related to any failure to disclose, or actual or attempted cover up or obfuscation of, any of the

conduct described in the Disclosure Statement, including in respect of any alleged fraud related thereto").

***Defendant***

13. Defendant is an individual residing in the state of Michigan. Upon information and belief, Defendant acted as a financial advisor and/or broker that sold securities to the public and provided investment services.

14. Defendant sold Notes and Units to unsuspecting Investors, created marketing materials and sales scripts to facilitate the sale of Notes and Units to unsuspecting Investors (often targeting unsophisticated, elderly investors with Individual Retirement Accounts). In so doing, Defendant made materially false and fraudulent statements to induce Investors to provide money. In connection with such conduct, Defendant, directly or indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

## FACTUAL BACKGROUND

***The Fraud***

15. At least since July 2012 until shortly before they sought bankruptcy protection, the Debtors were operated as a Ponzi scheme. As this Court explained in its order confirming the Plan:

> The evidence demonstrates, and the Bankruptcy Court hereby finds, that (i) beginning no later than July 2012 through December 1, 2017, Robert H. Shapiro used his web of more than 275 limited liability companies, including the Debtors, to conduct a massive Ponzi scheme raising more than $1.22 billion from over 8,400 unsuspecting investors nationwide; (ii) the Ponzi scheme involved the payment of purported returns to existing investors from funds contributed by new investors; and (iii) the Ponzi scheme was discovered no later than December 2017.

16. The securities sold by Defendant (*i.e.*, the Debtors' Notes and Units) were not registered with the Securities and Exchange Commission (the "SEC") or applicable state securities agencies and there was no applicable exemption from registration. Nor was Defendant registered as broker-dealers with the SEC or applicable state agencies.

17. Investors were often told that they were investing money to be loaned with respect to particular properties owned by third parties, that those properties were worth substantially more than the loans against the properties, and that they would have the benefit of a stream of payments from these third parties for high-interest loans, protected by security interests and/or mortgages against such properties. Shapiro and his lieutenants represented to Investors that the Debtors' profits would be generated by the difference between the interest rate the Debtors charged its third-party borrowers and the interest rate it paid Investors.

18. In reality, these statements were lies. Investors' money was almost never used to make high-interest loans to unrelated, third-party borrowers, and there was no stream of payments; instead, Investors' money was commingled and used for an assortment of items, including maintaining a lavish lifestyle for Shapiro and his family, brokers' commissions, overhead (largely for selling even more Notes and Units to Investors), and payment of principal and interest to existing Investors. The money that was used to acquire properties (almost always owned by a disguised affiliate) cannot be traced to any specific Investor. These are typical characteristics of Ponzi schemes.

19. Because the Debtors operated as a Ponzi scheme, obtaining new money from Investors into the Ponzi scheme conferred no net benefit on the Debtors; on the contrary, each new investment was a net negative. Money was siphoned off to pay the expenses described above, so that the Debtors actually received only a fraction of the investment dollars. New

money also perpetuated the Ponzi scheme, as such money enabled the Debtors to return fictitious "profits" to early Investors – an essential component of the scheme, because "repaying" early Investors led to new investments, without which the house of cards would fall, as it eventually did. At the same time, each investment created an obligation to return to the defrauded Investor 100% of the investment, such that each new investment increased the Debtors' liabilities and ultimately left them unable to satisfy their aggregate liabilities.

***The Transfers***

20. Plaintiff is informed and believes and thereupon alleges that within the two years preceding the Initial Petition Date, Defendant received transfers totaling not less than the amount set forth on Exhibit A hereto (the "Two Year Transfers"), including commission payments and other compensation. The Two Year Transfers – including the transferor, its Petition Date, the date of each transfer, and the amount of each transfer – are set forth on Exhibit A.

21. Plaintiff is informed and believes and thereupon alleges that within the four years preceding the Initial Petition Date, Defendant received transfers totaling not less than the amount set forth on Exhibit A hereto (the "Four Year Transfers" and, collectively with the Two Year Transfers, the "Transfers"), including commission payments and other compensation. (The Four Year Transfers are inclusive of the Two Year Transfers, but Plaintiff does not seek to recover the same sum more than once.) The precise Four Year Transfers – including the transferor, its Petition Date, the date of each transfer, and the amount of each transfer – are set forth on Exhibit A.

## FIRST CLAIM FOR RELIEF

**Avoidance and Recovery of Actual Intent Fraudulent Transfers – Bankruptcy Code**

22. Plaintiff realleges and incorporates herein Paragraphs 1 through 21, as if fully set forth herein.

23. The Two Year Transfers constituted transfers of the Debtors' property.

24. The Two Year Transfers were made by the Debtors with actual intent to hinder or delay or defraud their creditors insofar as the services allegedly provided in exchange for such transfers perpetuated a Ponzi scheme.

25. The Two Year Transfers were made to or for the benefit of Defendant.

26. As a result of the foregoing, Plaintiff is entitled to judgment pursuant to Bankruptcy Code sections 548(a), 550(a), and 551: (a) avoiding the Two Year Transfers free and clear of any claimed interest of Defendant, (b) directing that the Two Year Transfers be set aside, and (c) recovering such Two Year Transfers or the value thereof from Defendant for the benefit of the Liquidation Trust.

## SECOND CLAIM FOR RELIEF

**Avoidance and Recovery of Constructive Fraudulent Transfers – Bankruptcy Code**

27. Plaintiff realleges and incorporates herein Paragraphs 1 through 26, as if fully set forth herein.

28. The Two Year Transfers constituted transfers of the Debtors' property.

29. The Two Year Transfers were made by the Debtors for less than reasonably equivalent value at a time when the Debtors (i) were insolvent; and/or (ii) were engaged or about to engage in business or a transaction for which any capital remaining with the Debtors were an

unreasonably small capital; and/or (iii) intended to incur, or believed that Debtors would incur, debts beyond their ability to pay as such debts matured.

30. The Two Year Transfers were made to or for the benefit of Defendant.

31. As a result of the foregoing, Plaintiff is entitled to judgment pursuant to Bankruptcy Code sections 548(a), 550(a), and 551: (a) avoiding the Two Year Transfers free and clear of any claimed interest of Defendant, (b) directing that the Two Year Transfers be set aside, and (c) recovering such Two Year Transfers or the value thereof from Defendant for the benefit of the Liquidation Trust.

## THIRD CLAIM FOR RELIEF

### Avoidance and Recovery of Actual Intent Voidable Transactions – State Law

32. Plaintiff realleges and incorporates herein Paragraphs 1 through 31, as if fully set forth herein.

33. The Four Year Transfers constituted transfers of the Debtors' property.

34. The Four Year Transfers were made by the Debtors with actual intent to hinder or delay or defraud their creditors insofar as the services allegedly provided in exchange for such transfers perpetuated a Ponzi scheme.

35. The Four Year Transfers were made to or for the benefit of Defendant.

36. Each Debtor that made any of the Four Year Transfers had at least one creditor with an allowable unsecured claim for liabilities, which claim remained unsatisfied as of the Petition Date.

37. The Four Year Transfers are avoidable under applicable law – California Civil Code section 3439.04(a)(1) and/or comparable provisions of law in other jurisdictions that have adopted the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act or the

Uniform Fraudulent Conveyance Act – by a creditor holding an allowed unsecured claim and thus by Plaintiff pursuant to Bankruptcy Code section 544(b).

38. As a result of the foregoing, Plaintiff is entitled to judgment pursuant to Bankruptcy Code sections 544(b), 550(a), and 551: (a) avoiding the Four Year Transfers free and clear of any claimed interest of Defendant, (b) directing that the Four Year Transfers be set aside, and (c) recovering such Four Year Transfers or the value thereof from Defendant for the benefit of the Liquidation Trust.

## FOURTH CLAIM FOR RELIEF

### Avoidance and Recovery of Constructive Voidable Transactions – State Law

39. Plaintiff realleges and incorporates herein Paragraphs 1 through 38, as if fully set forth herein.

40. The Four Year Transfers constituted transfers of the Debtors' property.

41. The Four Year Transfers were made by the Debtors for less than reasonably equivalent value at a time when the Debtors (i) were insolvent; and/or (ii) were engaged or was about to engage in business or a transaction for which any capital remaining with the Debtors were an unreasonably small capital; and/or (iii) intended to incur, or believed that it would incur, debts beyond their ability to pay as such debts matured.

42. The Four Year Transfers were made to or for the benefit of Defendant.

43. At the time of and/or subsequent to each of the Four Year Transfers, each Debtor that made any of the Four Year Transfers had at least one creditor with an allowable unsecured claim for liabilities, which claim remained unsatisfied as of the Petition Date.

44. The Four Year Transfers are avoidable under applicable law – California Civil Code section 3439.04(a)(2) and/or comparable provisions of law in other jurisdictions that have

adopted the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act or the Uniform Fraudulent Conveyance Act – by a creditor holding an allowed unsecured claim and thus by Plaintiff pursuant to Bankruptcy Code section 544(b).

45. As a result of the foregoing, Plaintiff is entitled to judgment pursuant to Bankruptcy Code sections 544(b), 550(a), and 551: (a) avoiding the Four Year Transfers free and clear of any claimed interest of Defendant, (b) directing that the Four Year Transfers be set aside, and (c) recovering such Four Year Transfers or the value thereof from Defendant for the benefit of the Liquidation Trust.

**FIFTH CLAIM FOR RELIEF**

**Sale of Unregistered Securities (Securities Act Sections 5(a), 5(c), and 12(a))**

46. Plaintiff realleges and incorporates herein Paragraphs 1 through 45, as if fully set forth herein.

47. The Notes and Units sold by Defendant were securities within the meaning of the Securities Act.

48. No registration statement was filed or in effect with the SEC pursuant to the Securities Act with respect to the securities issued by the Debtors as described in this Complaint and no exemption from registration existed with respect to these securities.

49. From in or about July 2012 through at least December 4, 2017, Defendant directly and indirectly:

a. made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

b. carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; and/or

c. made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security,

without a registration statement having been filed or being in effect with the SEC as to such securities.

50. By reason of the foregoing, Defendant violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

51. The Investors who contributed their claims to the Liquidation Trust purchased the unregistered securities issued by the Debtors and as a direct and proximate result sustained significant damages. Accordingly, the Liquidation Trust has standing under Section 12(a)(1) of the Securities Act, 15 U.S.C. § 77*l*(a)(1), to bring a cause of action seeking damages based on Defendant's violations of Section 5(a) and 5(c) of the Securities Act.

52. As a result of the foregoing, Plaintiff is entitled to judgment holding Defendant liable for the sale of unregistered securities, as set forth in Exhibit B, or in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF

### Fraud

53. Plaintiff realleges and incorporates herein Paragraphs 1 through 52, as if fully set forth herein.

54. Defendant misrepresented the facts to Investors, including by making affirmative misrepresentations and by concealing and failing to disclose the true facts. Among the misrepresentations were that Investors were often told that they were investing money to be loaned with respect to particular properties owned by third parties, that those properties were worth substantially more than the loans against the properties, and that they would have the

benefit of a stream of payments from these third parties for high-interest loans, protected by security interests and/or mortgages against such properties.

55. In reality, these statements were lies. Investors' money was almost never used to make high-interest loans to unrelated, third-party borrowers, and there was no stream of payments; instead, Investors' money was commingled and used for an assortment of expenses, including maintaining a lavish lifestyle for Shapiro and his family, brokers' commissions, overhead (largely for selling even more Notes and Units to Investors), and payment of principal and interest to existing investors. The money that was used to acquire properties (almost always owned by a disguised affiliate) cannot be traced to any specific Investor.

56. Defendant made these misrepresentations knowingly, with scienter, and with intent to defraud Investors.

57. The Investors who contributed their claims to the Liquidation Trust justifiably relied on Defendant's misrepresentations of facts, and as a direct and proximate result sustained hundreds of millions of dollars in damages.

58. As a result of the foregoing, Plaintiff is entitled to judgment holding Defendant liable for fraud, as set forth in Exhibit B, or in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF

### Aiding and Abetting Fraud

59. Plaintiff realleges and incorporates herein Paragraphs 1 through 58, as if fully set forth herein.

60. Shapiro – an architect of the fraud – also misrepresented the facts to Investors, and did so knowingly, with scienter, and with intent to defraud Investors. The Investors who contributed their claims to the Liquidation Trust justifiably relied on Shapiro's

misrepresentations of facts, and as a direct and proximate result sustained hundreds of millions of dollars in damages.

61. Defendant knowingly and substantially assisted Shapiro in defrauding Investors.

62. Defendant was aware of Shapiro's fraud and acted knowingly in providing substantial and material assistance to Shapiro.

63. Defendant substantially benefited by receiving income, commissions, and bonuses.

64. As a result of the foregoing, Plaintiff is entitled to judgment holding Defendant liable for aiding and abetting fraud, as set forth in Exhibit B, or in an amount to be proven at trial, in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, by reason of the foregoing, Plaintiff requests that the Court enter judgment:

**(1)** On the first and second claims for relief, (a) avoiding the Two Year Transfers free and clear of any claimed interest of Defendant, (b) directing that the Two Year Transfers be set aside, and (c) ordering Defendant to pay to Plaintiff $78,724.58;

**(2)** On the third and fourth claims for relief, (a) avoiding the Four Year Transfers free and clear of any claimed interest of Defendant, (b) directing that the Four Year Transfers be set aside, (c) ordering Defendant to pay to Plaintiff $84,269.40;

**(3)** On the fifth claim for relief, holding Defendant liable for damages, in the amount of $1,100,572.05 for sale of Notes and/or Units as set forth in Exhibit B, or in an amount to be proven at trial, arising from Defendant's sale of unregistered securities;

**(4)** On the sixth claim for relief, holding Defendant liable for fraud, for $1,100,572.05 for sale of Notes and/or Units as set forth in Exhibit B in an amount to be proven at trial;

**(5)** On the seventh claim for relief, holding Defendant liable for aiding and abetting fraud, in the amount of $1,100,572.05 for sale of Notes and/or Units as set forth in Exhibit B, or in an amount to be proven at trial; and

**(6)** On all claims for relief, awarding Plaintiff prejudgment interest as permitted by law, costs of suit, and such other and further relief as is just and proper.

Dated: November 26, 2019
Wilmington, Delaware

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Colin R. Robinson*

Richard M. Pachulski (CA Bar No. 90073)
Andrew W. Caine (CA Bar No. 110345)
Bradford J. Sandler (DE Bar No. 4142)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)
Telephone: 302-652-4100
Fax: 302-652-4400
Email: rpachulski@pszjlaw.com
acaine@pszjlaw.com
bsandler@pszjlaw.com
crobinson@pszjlaw.com

*Counsel to Plaintiff, as Liquidating Trustee of the Woodbridge Liquidation Trust*